## Kulp v. City of Philadelphia et al.

*Municipal law—Philadelphia ordinance—Subsidizing corporation conducting opera—Invalidity of—Act of March 11, 1789.*

1. An ordinance of the City of Philadelphia subsidizing a private corporation engaged in conducting operas with a view to improving the musical education of the community, and not for the pecuniary profit of the shareholders, by making an appropriation to such corporation is *ultra vires* and void.

2. The maintenance of opera as a means of cultivating the musical taste and education of the inhabitants of the city is not a municipal function.

3. Such an ordinance is not authorized by the Act of March 11, 1789, 2 Sm. Laws, 462, which confers upon the mayor and councilmen of the City of Philadelphia the power to enact such ordinances as shall be necessary or convenient for the welfare of the city; the welfareof the city as an agency of government is intended by the act, and not the general welfare of its inhabitants.

4. Aside from the above considerations, the ordinance in the instant case is open to objection in that, under the disguise of a contract to purchase admission tickets, it binds the city to pay $25,000 to a private corporation without limitation or audit and without receiving any return except the tickets purchased for distribution, which would be a benefit to only a few people.

Exceptions to adjudication of trial judge. C. P. No. 4, Phila. Co., Dec. T., 1925, No. 10141, in Equity.

*Elton J. Buckley*, for plaintiff.

*Owen J. Roberts* and *Henry M. Tracy*, for defendants.

FINLETTER, J., June 20, 1927.—An ordinance of the City of Philadelphia was passed subsidizing a private corporation, called the Civic Opera Company, by an appropriation to it of $25,000. The legality of the appropriation is questioned by the complainant, a taxpayer, on the ground that the city (1) has no charter power to make an appropriation for such purposes; or (2) to make it in the manner in which it is done.

The complainant criticises the action of the city upon two grounds, (1) because (she says) it offends against the provisions of the Constitution, art. IX, § 7, forbidding any special grants or loans to individuals or corporations; and (2) because, aside from this provision, she alleges that the object of the ordinance is not within the corporate powers of the city.

The power of the city is based by the respondents upon the general welfare clause of the original charter of the city, contained in the Act of March 11, 1789, § 16, 2 Sm. Laws, 462, which provides: "The mayor, recorder, aldermen and common councilmen, in common council assembled, shall have full power and authority to make, ordain, constitute and establish such and so many laws, ordinances, regulations and constitutions (provided the same shall not be repugnant to the laws and Constitution of this Commonwealth) as shall be necessary or convenient for the government and welfare of the said city, and the same to enforce, put in use and execution by the proper officers, and at their pleasure, to revoke, alter and make anew as occasion may require."

The case turns on what is meant by the words "the welfare of the city." There can be no question, in our opinion, of its meaning. It was not the welfare of the community as a mass or of the individual citizen, but the welfare of the city as a municipality and a political agency that was in mind. If any other interpretation were given to the language, it would follow that any good object tending towards the welfare, either of the individual citizen or of the community as a whole, would be within the charter power of the municipality. This cannot be the reasonable interpretation of a document intended as a charter of a political division of the State, an agency whose powers are usually much more restricted and limited to functions of the city considered as

an agency of government. It was the welfare of such an agency that was in mind, not the general welfare of its inhabitants.

If the welfare clause of the Act of 1789 justifies the city in going into the operatic business, it would quite logically justify it in conducting theatrical performances, moving pictures or any other means of adding to the welfare of the city by elevating the public taste. Nor, if respondents are right, need council stop there. They might commit the city to commercial or manufacturing enterprises, or, indeed, to any other object which would promote the welfare of the individual citizen or of the community.

"If it be said that a benefit results to the local public of a town by establishing manufacturies, the same may be said of any other business or pursuit which employs capital or labor. The merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner are equally promoters of the public good and equally deserving the aid of the citizens by forced contributions. No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two-thirds of the business men of the town:" 7 McQuillen on Municipal Corporations, § 359a.

"It is elementary that the powers of a municipal corporation may be used for public or municipal purposes only. A municipal corporation is a public institution created to promote public, as distinguished from private, objects. All its powers, properties and offices constitute a public trust to be administered by its municipal authorities and public servants for the time being as such public trust and not to aid private business ventures. This familiar and salutary principle has been stated in various forms by courts of last resort of the highest character:" 7 McQuillen on Municipal Corporations, § 699.

The functions of a modern city corporation in general include the maintenance of public safety and order, protection against fire, the care of the public health, including the removal of causes of disease, the removal of garbage, cleaning the streets, providing sewers, providing light and air in congested districts, regulating food and water supply, maintaining parks, docks, wharves and hospitals, the relief of the poor, transit and the direction of traffic and the use of streets, and the like. But, however thoroughly these functions enter into the conception of a modern city, most of them are creatures of statute and not inherent in the idea of a city.

It is true that the conception of the functions of a city has widened as civilization has become more complex, that more subjects are legitimately within the realm of city activity than would have been thought within its sphere a hundred years ago. Street lighting, water supply, sewers and fire departments were novelties and considered extraordinary advances in Franklin's time, but all were added to the city's duties by express acts of assembly. For example, there can be no more important subject for a government than the education of its citizens, but no public school was opened in Pennsylvania until the power was expressly conferred by statute. "The establishment of a school is not an essential municipal function and becomes so only by statute:" 5 McQuillen on Municipal Corporations, § 2167.

The respondents would add the spread of musical culture to the city's activities. That no justification can be found in the charter for the city's engaging in the giving of operatic performances seems to be recognized by the stress the respondents put upon the maintenance by them of a music school and the distribution of tickets to students in colleges and schools. Evidently they think that the education of its citizens in music is a municipal function. The objection to this proposition is that the city corporation has

never received from the legislature the power to engage in this subject, and that it is not in this community recognized as an inherent part of a city's business. The references made in the preamble of the ordinance to the activities of the association in conducting a conservatory of and teaching music are a mere makeweight. No reference is made to them in the enacting clauses of the ordinance, and the association does not engage itself to maintain a school. Indeed, it has no corporate power to do so. Its charter purposes are limited to the giving of operatic performances. Neither is the subject of teaching music within the city's corporate power. That is a function of the Board of Education. So that the education of the citizen in music must fail as a justification for the proposed appropriation. The respondents must stand or fall upon the power of the city to conduct an opera house, for if the city has itself no such power, it cannot authorize an agent to do so.

It may be that in the cities of Europe music has been regarded as a municipal function. We are informed that this is the fact, but we are ignorant whether the power to conduct opera houses in Berlin, Paris and Vienna is based upon inherent power of the city, as a city, or upon legislation. We understand, however, that in all these cities the municipality itself conducts the exhibitions, owns the opera house, pays the musicians and sells the tickets.

The very novelty of the present proposition shows that the giving of operatic performances is not recognized as a municipal function in this community. The industry of counsel has not produced any precedent in the United States for the proposed action, nor have we been able to find any. In the only case in which the question was raised, Brooks v. Brooklyn, 146 Iowa, 136; 124 N. W. Repr. 868, the decision was adverse to the respondents.

On the other hand, in all the cases in which the welfare clause of the Act of 1789 was discussed, the powers conferred by it were confined to strictly municipal purposes.

All that could be said for the proposed opera house was true of the purpose of the Historical Pageant Association, an appropriation in aid of which was passed upon by the Supreme Court in Historical Pageant Ass'n v. Philadelphia, 260 Pa. 447.

The purpose of that corporation was "the education of the citizens in the history of the city and the encouragement of civic pride and patriotism." Objects, we take it, equally praiseworthy and quite as conducive to the welfare of the people of the city as their musical culture. In an opinion by Ferguson, J., adopted by the Supreme Court, that learned judge said: "In our opinion, the appropriation was invalid. The efforts of the incorporators were praiseworthy and generous, and an instructive entertainment was provided for those citizens who had opportunity to attend the pageant. Notwithstanding these facts, we think it was not a municipal enterprise. The City of Philadelphia, as a municipality, received no benefit. In the nature of things, it was possible for only a limited number of citizens to witness the entertainment. Many of these paid for the privilege and others obtained the privilege without cost. The vast body of citizens received no benefit whatever:" Historical Pageant Ass'n v. Philadelphia, 260 Pa. 447. All that was said in the opinion quoted applies with equal force to the plan of the respondents.

The appropriations to the policemen's and firemen's pension funds, which were approved in Com. v. Walton, 182 Pa. 373, and Com. v. Barker, 211 Pa. 610, have been referred to by counsel, but the police power, including the protection of property against fire, has always been recognized as inherently within the functions of a city; so that the payment of policemen and fire-

men, either directly or by way of pension, was no novelty and was a recognized municipal function, Chief Justice Sterrett saying, "The maintenance of a police pension fund is a strictly municipal use;" and Chief Justice Mitchell, "Protection of the city from fire is a municipal function of the highest importance." The real question, in the cases referred to, was the administration of the funds in question by other than the regular municipal agents.

Nor do the cases of Stegmaier v. Goeringer, 218 Pa. 499; Tatham v. Philadelphia, 2 W. N. C. 564; Tagg v. Philadelphia, 18 W. N. C. 79, and Morton v. Philadelphia, 4 Dist. R. 523, establish a precedent for the proposed action. The commemoration of important "historical," "military" and "civic" events, and the right of the municipality to appropriate public funds for their proper observance, has always been recognized as a municipal function.

There remains to be considered the manner in which the ordinance before us authorizes the city to deal with the subject. The method adopted is particularly objectionable to the sense of orderly finance. A private corporation, of lofty professions, to be sure, and highly respectable membership, but still a private corporation, is conducting an opera house, employs singers, pays them and charges admissions to the performances. To the treasury of this private corporation the ordinance would, under the thin disguise of a contract to purchase admission tickets, pay $25,000 without limitation or audit, and receive no return except some tickets for distribution to necessarily a very small number of people. The opera company does not contract to give any performance. To be sure, it cannot collect the $2500 instalments unless it gives one, but it could give none and not be liable for breach of contract. Whether the addition of $25,000 to the treasury of the opera company will leave it with a profit or loss cannot be told. The opera company says that it puts back all of its profits into better performances. It is not bound to do so by any contract with the city, and no provision is made for participation in the profits by the city, or for repayment if its subsidy result in a favorable balance sheet.

In Stegmaier v. Goeringer, 218 Pa. 499, Mr. Justice Elkin, while recognizing the power of a city to make certain expenditures, said: "In the exercise of this power, the rule should be observed that moneys appropriated for these purposes should be expended under the supervision and direction of the proper officer or department of the city government, and that bills should be presented, vouchers filed and the accounts audited in the same manner as is provided by law for the expenditure of other public funds." While there may be some exceptional situations, as in Com. v. Pittsburgh, 183 Pa. 202, and in the police and firemen's beneficiary association cases, this is certainly the general rule. Mr. Justice Elkin goes on to say: "This is extreme exercise of municipal power which should be carefully guarded, and, when exercised, a committee of private citizens should present bills and vouchers showing for what purpose, and how, the moneys were expended, and these accounts should be examined and audited before warrants are drawn for their payment. The safer rule is to require the moneys thus appropriated to be expended by proper officials of the city government, and the bills and vouchers should be presented for payment in the ordinary and regular way." And it will be noticed that the Supreme Court points out in the police and firemen's cases that the administration of the city's contributions to those agencies is in the potential control of the city. No such power or advantage is retained by the ordinance before us, but upon the delivery of the tickets provided for in the ordinance, the payment by the city of the ten $2500 instalments is final and unassailable.

Complainant's argument that the constitutional provision cited applies to the charter of the City of Philadelphia, or rather that part of it contained in the Act of 1789, has already been ruled in an opposite sense by the Supreme Court in several cases, among them Com. v. Walton, 182 Pa. 373, and Com. v. Barker, 211 Pa. 610, Chief Justice Sterrett saying: "The Constitution declares what the legislature shall not do. . . . It forbids such legislation thereafter. . . . Its prohibitions are wholly prospective." The only subject, therefore, before us is that which we have discussed, the interpretation of the charter of the city, unaffected by the constitutional provision referred to; that is to say, whether or not the general welfare clause permits the contemplated payment. This we must answer in the negative.

The exceptions to the adjudication of the trial judge are dismissed.